YU, J. (dissenting)
¶ 45 I am concerned with our adoption of an archaic feature of product liability law in *1220 order to compensate the plaintiff for claims already allowed under modem product liability standards. I agree with the majority that, in the right case, we should adopt the "apparent manufacturer" doctrine from the Restatement (Second) of Torts § 400 (Am. Law Inst. 1965). I also agree that the "objective reliance" test is the correct test under Washington law. I disagree, however, with the way the majority has applied that test here.
¶ 46 While compensation for injuries caused by products is imperative, we should not expand the apparent manufacturer doctrine to circumvent the reality that the plaintiff's claims are subject to an asbestos injury bankruptcy trust. The apparent manufacturer doctrine is not intended to address when a parent company is liable for a subsidiary's actions. Thus, we should reject the majority's attempt to shoehorn that issue into a doctrine where it simply does not fit in order to achieve a particular outcome.
¶ 47 The trial court's analysis of the plaintiff's claims from the perspective of a reasonable purchaser was correct. I would therefore affirm the Court of Appeals and hold that Pfizer Inc. cannot be held liable in Margaret Rublee's wrongful death action as a matter of law. As such, I would not reach Pfizer's alternative argument that it cannot be held liable because it was not in the "chain of distribution." However, I must address the majority's incorrect conclusion that no such requirement exists. I respectfully dissent.
ANALYSIS
¶ 48 The majority is generally accurate in its recitation of the history and purpose of the apparent manufacturer doctrine. See majority at 1211-13. However, the majority's application of the objective reliance test is entirely inconsistent with its history and purpose because it ignores the crucial factor of reliance. I would hold that where the ordinary consumer of a product is not the ordinary purchaser, the objective reliance test must consider the ordinary purchaser's perspective. The perspective of consumers who play no role in purchasing the product cannot create a genuine issue of material fact precluding summary judgment.
A. The objective reliance test should be applied from the perspective of the ordinary purchaser
¶ 49 Prior to the adoption of strict products liability in the 1960s and 1970s, a person who was injured by an unsafe product was required to prove negligence by the manufacturer or the seller. See generally Stein v. Pfizer Inc., 228 Md. App. 72, 87-88, 137 A.3d 279 (2016) (citing RESTATEMENT OF TORTS §§ 388, 394 - 95 ( AM. LAW INST . 1934) ) (detailing the history of the apparent manufacturer doctrine). Manufacturers had more duties than sellers, so there were more ways to prove negligence by a manufacturer than negligence by a seller. For example, a manufacturer had a duty to warn of potential danger from use of a product; a seller did not. Id. A manufacturer had a duty to exercise reasonable care in manufacturing a potentially dangerous product; a seller did not. Id.
¶ 50 The apparent manufacturer doctrine emerged in cases where a retail seller or distributor held itself out to the public as the manufacturer, and where an ordinary purchaser would have no way of knowing who had actually manufactured the product. E.g., Carney v. Sears, Roebuck & Co. , 309 F.2d 300, 304-05 (4th Cir. 1962) (Sears liable for defects in ladder manufactured by another where purchaser relied on Sears's advertising and trade name on ladder); Burkhardt v. Armour & Co ., 115 Conn. 249, 264-65, 161 A. 385 (1932) (distributor of canned ham liable where the label containing the Armour name and trademark, but not the name of the actual manufacturer, would lead an ordinary person to infer that Armour guaranteed safety of can's contents); Thornhill v. Carpenter-Morton Co. , 220 Mass. 593, 596-97, 108 N.E. 474 (1915) (paint manufacturer and dealer held liable for damage caused by paint manufactured by another where it put its label on product and represented that it was the manufacturer).
¶ 51 As noted by the majority, the apparent manufacturer doctrine is a "species of estoppel." Majority at 1212. The doctrine applies where the seller "has induced the purchasing public to believe that it is the actual *1221 manufacturer, and to act on this belief-that is, to purchase the product in reliance on the apparent manufacturer's reputation and skill in making it." Hebel v. Sherman Equip. , 92 Ill. 2d 368, 371, 375, 442 N.E.2d 199, 65 Ill.Dec. 888 (1982). It is not intended to impose strict liability on everyone in the chain of distribution; its purpose is to hold sellers accountable for the reliance they induce.
¶ 52 It follows that whether a seller's representations have caused a purchaser to rely on a belief that the seller is the manufacturer of a product "must be judged from the viewpoint of the purchasing public, and in the light of circumstances as of the time of purchase." Id. at 375, 442 N.E.2d 199, 65 Ill.Dec. 888. In the case of consumer goods, the purchasing public consists of ordinary consumers. Kennedy v. Guess, Inc. , 806 N.E.2d 776, 784 (Ind. 2004) (purchasing public of umbrellas). But in commercial settings, the purchasing public is often different from the ordinary consumer. Hebel , 92 Ill. 2d at 375, 65 Ill.Dec. 888, 442 N.E.2d 199 (purchasing public of car washing equipment). In both cases, the objective reliance test should be applied from the perspective of a reasonable purchaser in the position of the actual purchaser.[1]
¶ 53 This does not mean that in cases where the consumer is not the purchaser, the consumer can never recover. It just means that the inquiry is whether an ordinary, reasonable purchaser might have relied on a mistaken belief that the product's seller was also its manufacturer. If so, then the apparent manufacturer may be liable for the consumer's injury. Heinrich v. Master Craft Eng'g, Inc. , 131 F.Supp.3d 1137, 1160 (D. Colo. 2015) ; Brandimarti v. Caterpillar Tractor Co. , 364 Pa. Super. 26, 36, 527 A.2d 134 (1987).[2]
B. The majority's reliance on "ordinary consumer expectation" is misplaced
¶ 54 Courts that have applied the objective reliance test in situations where the ordinary purchaser of a product is different from the ultimate consumer have uniformly done so from the perspective of an ordinary purchaser. Heinrich , 131 F.Supp.3d at 1160 ; Hebel , 92 Ill. 2d at 377, 65 Ill.Dec. 888, 442 N.E.2d 199 ; Stein , 228 Md. App. at 101, 137 A.3d 279 ; Brandimarti , 364 Pa. Super. at 36, 527 A.2d 134. The majority contends that "Washington's 'ordinary consumer expectation' approach" to product liability law dictates a different result. Majority at 1217-18. I disagree. The ordinary consumer expectation approach was adopted in a different context for a different purpose.
¶ 55 The ordinary consumer expectation approach is used to determine whether a product is not reasonably safe, resulting in strict liability for the seller, distributor, or manufacturer. RESTATEMENT (SECOND) OF TORTS § 402A. "This means that it must be unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer." Seattle-First Nat'l Bank v. Tabert , 86 Wash.2d 145, 154, 542 P.2d 774 (1975). This approach "allows the trier of the fact to take into account the intrinsic nature of the product," including factors not necessarily known at the time of purchase, such as relative cost, gravity of potential harm, and feasibility of eliminating the risk. Id. Thus, *1222 the focus in such a claim is " 'not upon the actions of the seller or manufacturer' " but on the nature of the product itself. Falk v. Keene Corp ., 113 Wash.2d 645, 649, 782 P.2d 974 (1989) (quoting Lenhardt v. Ford Motor Co ., 102 Wash.2d 208, 212, 683 P.2d 1097 (1984) ).
¶ 56 In contrast, the apparent manufacturer doctrine does focus on the actions of the seller. The doctrine does not deal with the question of whether liability exists for injuries caused by a particular product but solely with the question of whether a particular defendant can be treated as if they had manufactured the product. In this context, we do not ask what an ordinary person would expect based on the nature of the product, but whether an ordinary person would reasonably believe that the seller is the manufacturer and would reasonably rely on the seller's reputation when deciding whether to purchase the product.
C. Summary judgment was proper
¶ 57 Properly applied, the objective reliance test focuses on what a reasonable purchaser in the position of the actual purchaser would rely on. To subject Pfizer to apparent manufacturer liability, Rublee would need to prove that a reasonable purchaser of refractory products in the same position as a purchasing agent for the Puget Sound Naval Shipyard (PSNS) between 1966 and 1974[3] would have believed that Pfizer actually manufactured Insulag and Panelag and relied on that belief in making its purchasing decisions.
¶ 58 The record contains numerous examples of product information, promotional items, and correspondence available to the ordinary purchaser that contain both Pfizer and Quigley names and logos. The record also includes testimony from the late Mr. Rublee and a coworker stating that the Pfizer name appeared on bags of Insulag and Panelag used at their workplace. Taken individually and as a whole, the evidence does not create a genuine issue of material fact as to whether an ordinary purchaser of the products would believe that Pfizer was the manufacturer.
¶ 59 Rublee first points to examples of the logos that appeared on promotional materials after Pfizer's acquisition of Quigley. The Pfizer and Quigley logos appear side by side and are the same height. Underneath the combined logos are the words "Manufacturers of Refractories - Insulation," with no other indication of the relationship between the two companies. Clerk's Papers (CP) at 952, 1028.[4] These examples are taken out of context. They are part of a multipage product bulletin promoting Insulag. The cover of that bulletin clearly states that Insulag is "A QUIGLEY PRODUCT " and contains no reference to Pfizer. Id. at 2402-11.
¶ 60 Next, Rublee points to company letterhead "emblazoned with Pfizer's familiar oval logo." Pet. for Review at 3; see CP at 963. Petitioner overstates the prominence of the Pfizer logo. The Quigley Company logo appears centered at the top of the letterhead with the company's address underneath. At the bottom center of the letterhead are the words "A Subsidiary of PFIZER, INC." CP at 963. The oval Pfizer logo appears separately at the top left of the page. Additionally, the example provided is an announcement that Quigley was discontinuing the manufacture of Insulag and Panelag and contains the Quigley Company name above the signature.
¶ 61 The record also includes a pocket calendar that was distributed to potential purchasers by Quigley salespeople. Id. at 175-83. The Quigley logo appears prominently *1223 on the top of the cover with Quigley identified as a subsidiary of Pfizer at the bottom. Id. at 175. The inside cover is titled "Quigley Diary for 1974" and contains both the Pfizer and Quigley logos and indicates that Quigley is a subsidiary of Pfizer. Id. at 176. The third page is the most relevant. It lists Insulag and Panelag under the heading "Products Manufactured By QUIGLEY COMPANY, INC. A Subsidiary of Pfizer, Inc." Id. at 178.
¶ 62 Technical data sheets for both Insulag and Panelag also refer to both Quigley and Pfizer. Id. at 975, 1686. The predominant feature of these sheets is the stylized Quigley "Q" at the top. The Pfizer logo appears much smaller at the bottom right and clearly states underneath that Quigley is a subsidiary of Pfizer. A fine-print legal disclaimer appears on the lower left of the sheet that instructs readers not to copy or distribute the information without written permission from Pfizer.[5]
¶ 63 What the record does not contain is evidence of what appeared on the bags of Insulag and Panelag that were actually used at the shipyard and that actually caused Mr. Rublee's injuries.[6] There is, however, testimony from both Mr. Rublee and a coworker that Pfizer's name appeared on the products. Id. at 870, 878. For purposes of summary judgement, we assume this to be true. Even so, the record does not indicate how an ordinary purchaser of the product would have interpreted the packaging, or that they would have relied on it at all.
¶ 64 Any inquiry into the perspective of the reasonable purchaser must account for what is known by ordinary purchasers of the product.[7] The documents consistently refer to Insulag and Panelag as Quigley products and identify Quigley as a subsidiary of Pfizer. It would be clear to an ordinary purchaser that there was a relationship between the two companies, but "[a] parent/subsidiary relationship alone would not give rise to a conclusion that Pfizer manufactured the product."[8] Sprague v. Pfizer, Inc. , No. 14-5084 RJB, 2015 WL 144330, at *5 (W.D. Wash. Jan. 12, 2015) (court order) (quoting Turner v. Lockheed Shipbuilding Co. , No. C13-1747 TSZ, 2013 WL 7144096, at *3 (W.D. Wash. Dec. 13, 2013) (court order) ). This precludes application of the apparent manufacturer doctrine, and the trial court properly granted summary judgment to Pfizer.
D. Section 400 applies only within the chain of distribution
¶ 65 The majority holds that there is no chain of distribution requirement in Washington for apparent manufacturer liability. Majority at 1219. In doing so, the majority cites only to the Restatement and ignores persuasive holdings from other courts. I disagree with the majority's holding on this issue.
¶ 66 The plain text of section 400 makes it clear that a defendant must sell or distribute a product to be subject to liability under section 400. Section 400 is titled "Selling as Own Product Chattel Made by Another." RESTATEMENT (SECOND) OF TORTS § 400 (emphasis added). The rule states that "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." Id. Thus, for a party to be subject to the "same liability as though he were its manufacturer," it must both (1) put out the product and (2) do so as if the product were its own. Id. The comments explain that "[t]he *1224 words 'one who puts out a chattel' include anyone who supplies it to others for their own use or for the use of third persons, either by sale or lease or by gift or loan." Id. cmt. a.
¶ 67 Most courts that have adopted section 400 have applied it "only where a retailer or distributor has held itself out to the public as the manufacturer of the product." Torres v . Goodyear Tire & Rubber Co ., 867 F.2d 1234, 1236 (9th Cir. 1989) (collecting cases). And "[m]any courts have declined to extend [section] 400 beyond sellers and retailers of defective products." Yoder v . Honeywell Inc ., 104 F.3d 1215, 1223 (10th Cir. 1997) (collecting cases). The only relevant exception appears to be Brandimarti, where Caterpillar faced apparent manufacturer liability because even though it "did not manufacture the product at issue and was not a supplier of the product participating in the chain of distribution, it did permit its name to appear on the equipment." 364 Pa. Super. at 36, 527 A.2d 134.
¶ 68 Consistent with the clear weight of authority, I would hold that section 400 is limited to those in the chain of distribution of a product.
¶ 69 The record contains excerpts from Pfizer annual reports, purchase orders for asbestos, budget documents, and other evidence that Rublee says create an issue of fact as to whether Pfizer has inserted itself into the chain of distribution. Whether the evidence supports that assertion or whether it merely indicates a corporate parent-subsidiary relationship is an issue that should be addressed by the trial court in the first instance. However, it is not necessary to remand for further consideration of that issue in this case because the trial court correctly concluded that no reasonable, ordinary purchaser would believe Pfizer was the manufacturer of Insulag and Panelag.
CONCLUSION
¶ 70 The objective reliance test asks whether a seller's representations would lead a reasonable person to believe that the seller, and not some other party, was the actual manufacturer, and to rely on that belief in deciding whether to purchase and use the product. This question can be answered only by considering the perspective of the purchaser because the purchaser is the one who makes the decision. Based on the record in this case, no reasonable ordinary purchaser would believe Pfizer was the manufacturer. I therefore respectfully dissent.
Gordon McCloud, J.
Fairhurst, C.J.
González, J. (concurring in dissent)
¶ 71 I concur with my colleagues that the common law apparent manufacturer doctrine governs pre-Product Liability Act claims. I also concur with my colleagues that the objective reliance test is the correct test. I concur with the dissent that when the ordinary purchaser of the product is not the ordinary consumer, we view objective reliance from the ordinary purchaser's perspective and that under that perspective, summary judgment was properly granted. As the dissent amply demonstrates, on the evidence presented, the ordinary purchaser of refractory products at the time would not have believed Pfizer Inc. was the manufacturer. Dissent at 1222-23.
¶ 72 On these facts, we need not reach whether an apparent manufacturer is within the direct chain of distribution of the product. I would not.
¶ 73 With these observations, I respectfully concur in dissent.

The majority contends that applying the objective reliance test from the perspective of an ordinary purchaser "broadly imports a sophisticated user defense into Washington law," and "inches toward expanding the learned intermediary doctrine without a public policy necessity." Majority at 1217. That is simply not the case. When a seller induces the public to purchase a product on the belief that it is the manufacturer of that product, it is held liable as if it had actually manufactured the product. The extent of that liability has nothing to do with the sophistication of either the user or the purchaser and does not take into account what a "learned intermediary" would know.

I disagree with the majority's claim that Brandimarti "provides a useful example of how the reasonable consumer approach to objective reliance properly applies to cases involving nonconsumer products in commercial settings." Majority at 1217 n.8. In fact, Brandimarti held that Caterpillar was subject to liability as an apparent manufacturer because by placing its name on a forklift, it "could expect others to purchase the product in reliance on the skill and reputation associated with the Caterpillar name." 364 Pa. Super. at 36, 527 A.2d 134 (emphasis added). The ultimate consumer was the one who was injured, but the court's explicit focus was on the perspective of the ordinary purchaser.

Mr. Rublee began working at PSNS in 1966, Clerk's Papers (CP) at 864. Quigley discontinued the sale of Insulag and Panelag in 1974. Id. at 97.

Rublee also points out that a pre-acquisition logo contains the tagline "Manufacturer [singular] of Refractory Specialties and Paint" under the Quigley Company name while the combined post-acquisition logo says "Manufacturers [plural] of Refractories - Insulations" under the combined Pfizer and Quigley Company logos. Compare CP at 923 with CP at 952. The record, however, also contains several examples of the pre-acquisition logo using the plural "Manufacturers." E.g., id. at 2455, 2461, 2463. Regardless, the change in wording does not have the significance Rublee assigns to it because an ordinary purchaser at the time in question would not necessarily have known how Quigley advertised in the past. Rublee v. Carrier Corp ., 199 Wash. App. 364, 374 n.41, 398 P.3d 1247 (2017).

The sheets do not contain a telephone number. Contra majority at 1218.

The record contains three examples of what the product packaging might have looked like, but there is not enough information to support an inference that they represent the actual product packaging at issue. CP at 567, 1821, 1824.

The majority concedes that information known only to purchasers is relevant and rejects Rublee's argument that courts should look only at information available to the ultimate consumer. Majority at 1217-18. However, it makes no sense to consider information that is not available to the ultimate consumer if our inquiry is focused on the consumer's perspective. No reasonable person can detrimentally rely on information he or she does not have.

Pfizer concedes that Rublee could have brought claims against Pfizer based on Pfizer's corporate relationship with Quigley under theories such as successor liability and piercing the corporate veil. Resp't Pfizer Inc.'s Suppl. Br. at 1. However, these claims would be channeled to the federal bankruptcy trust.